UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SPORTSCARE OF AMERICA, P.C.,** | Civ. No. 2:10-cv-04414 (WJM) |
| **Plaintiff,** | |
| v. | **OPINION** |
| **MULTIPLAN, INC.,** *et al.*, | |
| **Defendants.** | |

**WILLIAM J. MARTINI, U.S.D.J.:**

     Plaintiff Sportscare of America, P.C. ("Sportscare") filed this action against twenty-two defendants, alleging that defendants violated the Employee Retirement Income Security Act of 1974 ("ERISA"), breached their fiduciary duties, and breached their duties to act in good faith.  Seven defendants have been dismissed from the action.  Eleven of the remaining defendants (collectively, "Defendants") have now filed motions.  Specifically, this matter comes before the Court on:

    (1)   A motion to dismiss and, in the alternative, for summary judgment, filed by Tower Life Insurance Company ("Tower");

    (2)   A motion to dismiss and, in the alternative, for summary judgment, filed by Guardian Life Insurance Company of America ("Guardian");

    (3)   A motion to dismiss and, in the alternative, for summary judgment, filed by Principal Life Insurance Company ("Principal");

    (4)   A motion to dismiss and, in the alternative, for summary judgment, filed by I.U.O.E. Local 15 Welfare Fund ("Local 15");

    (5)   A motion to dismiss and, in the alternative, for summary judgment, filed by Insurance Design Administrators, Inc. ("IDA");

    (6)   A motion to dismiss and, in the alternative, for summary judgment, filed by Coventry Health Care ("Coventry");

(7) A motion for judgment on the pleadings or, in the alternative, for summary judgment, filed by Nippon Life Insurance Company of America ("Nippon");

(8) A motion for summary judgment filed by Christian Brothers Services ("Christian Brothers");

(9) A motion to dismiss filed by Government Employees Health Association, Inc. ("GEHA");

(10) A motion to dismiss filed by National Association of Letter Carriers Health Benefit Plan ("NALC"); and

(11) A motion for summary judgment filed by Health Net, Inc.

Many of the Defendants make the same or substantially similar arguments in their motions. For that reason, Tower, Guardian, Principal, Local 15, IDA, Coventry, and Nippon will collectively be referred to as the "Tower Defendants." GEHA and NALC will collectively be referred to as the "GEHA Defendants." There was no oral argument on the motions. *See* Fed. R. Civ. P. 78(b).

For the reasons set forth below, the motions filed by the Tower Defendants are **DENIED**; the motion for summary judgment filed by Christian Brothers is **GRANTED**; the motions to dismiss filed by the GEHA Defendants are **GRANTED**; and the motion for summary judgment filed by Health Net, Inc. is **GRANTED**.

## I. BACKGROUND

Plaintiff filed this ERISA action against Defendants to enforce the terms of various health care plans insured or administered by Defendants (the "Plans"). The gravamen of Plaintiff's Second Amended Complaint (or the "Complaint") is that Defendants underpaid Plaintiff by paying Plaintiff as an "in-network" provider instead of an "out-of-network" provider. The facts and allegations are set forth below.

### A. The Parties

Plaintiff Sportscare is a health care provider. A health care provider is an individual or an institution that provides health care services to individuals or families. Health care providers include doctors, hospitals, clinics, primary care centers, and other medical facilities. Sportscare is a licensed physical therapy facility that provides individual physical therapy to patients who are recovering from injury, trauma, and illness. Second Amended Complaint ("Compl.") ¶ 2, ECF No. 124.

Defendants are health care payors. A health care payor is an entity other than a patient that finances or reimburses the cost of health services. Health care payors include

insurance companies, health maintenance organizations ("HMOs"), and employee welfare benefit plans. They also include third-party administrators, which are organizations that process insurance claims for other entities. Defendants, as health care payors, insure or administer various health care plans. A health care plan provides health care coverage for a select group of people, usually employees of a particular company. People covered by a health care plan are referred to as "plan participants." *See* 29 U.S.C. § 1002(7). If a participant designates someone else to receive benefits under a plan, that person is referred to as a "beneficiary." *See* 29 U.S.C. § 1002(8).

Defendants Tower, Guardian, Principal, Local 15, IDA, Coventry, and Nippon are traditional health care payors. Defendant Tower is a third-party administrator that administers claims for the Solvay America Welfare Benefits Plan, a self-funded group benefits plan ("Tower Plan"). Declaration of Rodney Gagne ("Gagne Decl.") ¶ 4, ECF No. 53-2. Defendant Guardian is an insurance company that insures and administers claims for the Guardian Group Insurance Plan ("Guardian Plan"). *See* Guardian Plan at 136, ECF No. 54-3. Defendant Principal is a third-party administrator that administers claims for a self-funded employee benefits plan ("Principal Plan"). Declaration of Sherry Ferry ("Ferry Decl.") ¶ 4, ECF No. 55-2. Defendant Local 15 is an employee welfare fund that administers claims for the Welfare Plan of the International Union of Operating Engineers Local 15, 15A, 15C & 15D, AFL-CIO, a group benefits plan for eligible participants of the union and their dependents ("Local 15 Plan"). Declaration of Patrick J. Keenan ("Keenan Decl.") ¶ 4, ECF No. 62-3. Defendant IDA is a third-party administrator that administers claims for Self Funded Benefits, Inc. d/b/a Insurance Design Administrators Plan ("IDA Plan"). Declaration of Daniel W. Roslokken ("Roslokken Decl.") ¶ 4, ECF No. 63-3. Defendant Coventry is the parent company of First Health Group Corporation, the third-party administrator for the Dairy Farmers of America Plan, a self-funded health benefit plan ("Coventry Plan"). Declaration of Metrus Anderson ("Anderson Decl.") ¶ 3, ECF No. 69-2. Defendant Nippon is an insurance company that insures participants of the Takasago International Corporation Group Benefit Plan ("Nippon Plan"). *See* Declaration of Sherry Ferry on Behalf of Nippon Life Insurance Company of America ("Ferry Nippon Decl.") Ex. 2, ECF No. 95-2. Principal is the third-party administrator for Nippon and processes claims on Nippon's behalf. Ferry Nippon Decl. ¶ 4.

Defendants Christian Brothers, GEHA, and NALC are non-traditional health care payors. Defendant Christian Brothers is the administrator for the Christian Brothers Employee Benefit Trust, a health plan for employees of the Catholic Church ("Christian Brothers Plan"). Declaration of Donna Phillips ("Phillips Decl.") ¶ 3, ECF No. 66-2. The Christian Brothers Plan has received a private letter ruling from the Internal Revenue Service ("IRS") stating that it is a "church plan" within the meaning of Section 414(e) of the Internal Revenue Code. Phillips Decl. ¶ 5. Defendant GEHA is a health insurance company that insures and administers a government-sponsored health benefit program for federal government employees. Affidavit of Larry McEnroe ("McEnroe Aff.") ¶ 3, ECF

3

No. 50-2. Defendant NALC is a health insurance company that insures and administers a health plan for city letter carriers employed by the U.S. Postal Service. Affidavit of Karen Moore ("Moore Aff.") ¶ 3, ECF No. 51-2.

Defendant Health Net, Inc. is a managed care organization and the parent company of separately licensed and regulated subsidiaries that provide health care benefits to individuals and groups. Declaration of Corinne Sotolov ("Sotolov Decl.") ¶ 3, ECF No. 60-3. Health Net, Inc. itself does not sponsor, insure or administer employee welfare benefit plans and does not provide health care coverage to any individual or entity. Sotolov Decl. ¶ 4. Health Net, Inc. does not pay for medical services provided to patients and does not pay claims for insureds or plan members. Sotolov Decl. ¶ 5.

Defendant Multiplan, Inc. ("Multiplan") is a preferred provider organization ("PPO").[1] Declaration of Marcy E. Feller ("Feller Decl.") ¶ 2, ECF No. 108-2. As a PPO, Multiplan enters into contracts with numerous health care providers. Defs.' Reply Br. at 3 n. 2, ECF No. 108. These providers agree to provide services to Multiplan clients at discounted rates. *Id.* The group of providers as a whole is referred to as the "PPO Network." *See id.* Multiplan also enters into agreements with health care payors, which gives these payors access to the discounted rates of the entire PPO network. *Id.* Payors offer incentives to their members to use participating providers in the form of lower co-pays and deductibles. *Id.* In exchange for agreeing to a discounted rate, these providers receive an increase in the number of patients, as the majority of the payors' members will seek medical services from providers in the PPO network. *Id.* When one of these providers renders services to a member of one of Multiplan's clients, Multiplan "reprices" the claim to reflect the discounted rate. *Id.*

In this case, each of the Defendants contracted with Multiplan in exchange for access to Multiplan's PPO network.

### B. The Plans

The Plans offered by Defendants distinguished between two types of health care providers: (1) "in-network" (or "participating") providers that participated in Multiplan's PPO network, and (2) "out-of-network" providers that did not participate in Multiplan's PPO network. *See* Compl. ¶¶ 5-6. For in-network providers, each Defendant would pay for services based on the discounted PPO rate. For out-of-network providers, each Defendant would pay for services based the usual, customary, and reasonable rate for such services (the "UCR rate"). *See e.g.*, Tower Plan at 16-44 (members charged a percentage of the "PPO rate" for "PPO Network Providers"; members charged a

---

[1] Multiplan chose to file an Answer, rather than a motion, so Multiplan is not one of the moving Defendants. Although Multiplan is discussed in detail, below, it should be noted that Multiplan did not file any of the moving papers, so all of the information about Multiplan was supplied by other parties.

percentage of the "usual, customary and reasonable fees" for "Non-PPO Network Providers"); IDA Plan § III-A-1 ("The fee for services, care and treatment rendered by Network Providers is considered payable under this Plan's provisions based on . . . pre-negotiated contracted rates. The fee for services, care and treatment rendered by Non-network Providers is considered payable under this Plan's provisions based on the Usual and Reasonable Charge for such services."). Members had to pay higher premiums for Plans that covered any of the costs of out-of-network providers. Compl. ¶ 7.

Under each of the Plans, members could submit claims to be reimbursed for eligible medical expenses. Benefits would be paid only if an administrator determined that the member (or other covered person) was entitled to those benefits under the terms of the Plan. *See e.g.*, Tower Plan at 99. Claims could be denied if, for example, the administrator determined that a procedure was not medically necessary, the procedure was considered experimental or investigational, or the procedure was not covered by the Plan. *See, e.g.*, IDA Plan § VII-7.

Each Plan also provided for an administrative appeal process in the event that a claim was denied. *See, e.g.*, Tower Plan at 103 ("In cases where a claim for benefits is denied, in whole or in part, and the covered person believes the claim has been denied wrongly, the covered person may appeal the denial"). For example, a person covered under the Tower Plan who wanted to file an appeal was required to submit the appeal, in writing, to the Tower appeals department in San Antonio, Texas within 180 days following the receipt of an adverse determination, along with supporting documentation and proof that the claim was covered under the Plan. *See* Tower Plan at 103. An administrator would then review the denial by applying the terms of the Plan to that person's medical circumstances, taking into account the person's documents and records, any relevant internal rules and guidelines, and, if necessary, the opinions of health care professionals with training and experience in the relevant field of medicine. *Id.*

The other Plans provided for similar administrative appeal processes. *See e.g.*, Guardian Plan at 28-34 (setting forth two-stage internal appeals process, followed by an external appeals process); Principal Plan at 59-60 (claimant must file an appeal in writing to the claims administrator within 180 days); Local 15 Plan at C-2–C-8 (appeal must be made in writing to Board of Trustees and must set forth claimant's name and address, the date of the denial, the reasons for the appeal, and supporting documentation); IDA Plan § VII-6 (claimant must file an appeal within 180 days); Coventry Plan at 60-61 (setting forth processes for oral and written appeals); Nippon Plan at 90-91 (claimant must file an appeal within 120 days).

### C. Billing Practices of Sportscare, Multiplan, and Defendants

According to the Complaint, Sportscare was, at one time, a participating provider in Multiplan's PPO network. Compl. ¶ 26. At some unspecified point in time, Sportscare terminated its agreement with Multiplan and became an out-of-network

5

provider for purposes of Defendants' Plans. Compl. ¶¶ 6, 26. However, after Sportscare became an out-of-network provider, each of the Defendants still maintained an ongoing relationship with the Sportscare staff. Compl. ¶ 13. When a patient sought services at one of Sportscare's facilities, the patient's doctor provided Sportscare with the relevant medical and insurance information for the patient. Compl. ¶ 10. A staff member at Sportscare would call the relevant Defendant to confirm receipt of the medical and insurance information, confirm the existence of insurance coverage, discuss the nature and extent of the treatment, the authorizations required, and the relevant copayments and deductibles, and discuss any other information affecting the patient's insurance coverage. Compl. ¶¶ 11-12. Staff members also filled out insurance verification forms in accordance with the instructions provided by each Defendant. Compl. ¶ 11. If Sportscare and the Defendant determined that the patient was eligible for out-of-network coverage, then the patient was permitted to schedule an appointment at a Sportscare facility. Compl. ¶ 14.

Before receiving medical services from Sportscare, a patient was required to complete and sign several forms, including a Patient Registration Information Form and a Health Insurance Portability & Accountability Act of 1996 ("HIPAA") notice. Compl. ¶¶ 15-17. The Patient Registration Information Form included a section entitled "Assignment of Benefits," which provided that:

> I irrevocably assign to Sportscare all my rights and benefits under any insurance contracts for payment for services rendered to me by Sportscare. I irrevocably authorize all information regarding my benefits under any insurance policy relating to any claims by Sportscare to be released to Sportscare. I irrevocably authorize Sportscare to file insurance claims on my behalf for services rendered to me. I irrevocably direct that all such payments go directly to Sportscare. . . . This assignment of benefits has been explained to my full satisfaction and I understand its nature and effect.

Patient Registration Information Form, Compl. Ex. A, ECF No. 124-1. The HIPAA notice authorized the Defendants to release to Sportscare any records relating to the patient's medical claims or treatment. HIPAA Notice, Compl. Ex. A, ECF No. 124-1. Once a patient had completed these forms, "Sportscare then assume[d] all responsibility for interacting with the Defendants concerning the patient's claim." Compl. ¶ 19.

To bill the Defendants for services rendered, the physical therapists at Sportscare filled out what is known as a "Form 1500." Compl. ¶ 20. The Form 1500 listed the patient's procedures, insurance information, the amounts owed to Sportscare, and any charges that were enumerated as part of the cost of treatment. *Id.* As a matter of course, Defendants accepted these claim forms and disbursed payment to Sportscare. Compl. ¶ 21. Sometimes, however, a Defendant would respond by sending Sportscare an

Explanation of Benefits ("EOB") limiting or denying a particular claim. Compl. ¶ 23. There were also instances in which the Defendants and Multiplan made adjustments to correct overpayments to Sportscare. Compl. ¶ 22. In these cases, the amounts overpaid were deducted from any additional payments that were due to Sportscare. *Id.* Most of the correspondence regarding claims processing was done through Multiplan. Compl. ¶ 24. Whenever a disagreement arose with respect to a claim, the practice of the parties was to engage in correspondence and telephone conversations until they came to an agreement to accept, modify, or reverse the original decision regarding payment. Compl. ¶ 25.[2]

### D. The Dispute

In January 2009, Sportscare discovered that it was being underpaid. Sportscare discovered that it was being paid at the discounted, in-network rate, when it should have been paid at the higher, out-of-network rate. Compl. ¶ 26. Sportscare raised the issue with Multiplan, explaining that Sportscare's in-network contract with Multiplan had long since been terminated, and that the payment amounts being made were severely deficient. Compl. ¶ 27. Multiplan disagreed. *Id.* Sportscare asserts, and Defendants do not dispute, that Multiplan did not have a formal system in place for resolving these types of disputes. *See* Opp. Br. at 15. Instead, representatives for Sportscare engaged in extensive negotiations with representatives from Multiplan via mail, email, and telephone in an attempt to resolve the issue. Certification of Rhonda Duer ("Duer Cert."), ECF No. 100.

In August 2009, after extensive email correspondence, Tanya Brinson, a representative in Multiplan's Atlanta, Georgia office, instructed Sportscare to "hold off on sending any more claims" until Multiplan's legal department had had a chance to review the issue. August 12, 2009 Brinson Email, Duer Cert. Ex. A. A representative for Sportscare then called Ms. Brinson to discuss the issue of sending claims. Duer Cert. ¶ 4. In response, Francesca Martz, a Multiplan Network Development Specialist, called Sportscare to reiterate that Sportscare should not send any more claims. *Id.*

Sportscare was then directed to Carrie Gardner, a Provider and Client Service Manager for Multiplan. Duer Cert. ¶ 4. After some follow up from Sportscare, Ms. Gardner emailed Sportscare saying, "I assure you that this issue is a top priority and our Legal department is aware of this issue as well as our Executive management." August 27, 2009 Gardner Email, Duer Cert. Ex. C. After another month passed with no result, Sportscare followed up with Ms. Gardner, and Ms. Gardner responded stating, "[o]ur [Executive Vice President and General Counsel], Marcy Feller is reviewing this dispute. She will reach out to you if she needs any information, otherwise all communications must run through me." September 25, 2009 Gardner Email, Duer Cert. Ex. D.

---

[2] None of the parties explain why Sportscare and Multiplan continued to correspond even though Sportscare was no longer part of Multiplan's PPO network.

Finally, on October 14, 2009, Adam J. Altkin, Vice President of Service Operations at Mutliplan, wrote a letter to Sportscare concluding that the claims were reimbursed correctly, and stating that "Sportscare of America is bound to accept all claims reimbursed at the MultiPlan rate as payment in full." October 14, 2009 Altkin Ltr., Duer Cert. Ex. H. The letter further stated that "Multiplan considers this matter closed." *Id.* The letter copied Ms. Gardner, Ms. Feller, and Jeanne Schutter, the Vice President of National Ancillary Contracting. *Id.*

The next day, on October 15, 2009, Ms. Gardner sent an email to Sportscare attaching the Altkin letter and stating, "[a]s a result of our findings, we will not be adjusting any claims." October 15, 2009 Gardner Email, Duer Cert. Ex. F. The email further stated, "we have been sent numerous boxes of claims in dispute[.] [U]nless I hear otherwise from you, we will be destroying the records in those boxes." *Id.* Sportscare requested that the boxes be returned and, one week later, Sportscare received 15 boxes containing approximately 12,000 pages of claims. Duer Cert. ¶ 9. This encompassed approximately 2,500 individual claims for patients who were insured by nearly two dozen insurance companies. Opp. Br. at 4. Sportscare did not submit the 2,500 individual claims in dispute to the twenty-two individual Defendants. Pl.'s Counterstatement of Material Facts ¶ 2, ECF No. 101-1.

### E. Procedural History

On July 19, 2010, Sportscare filed an 89-count complaint in the Superior Court of New Jersey, Morris County, asserting a barrage of state common law claims. Notice of Removal Ex. B, ECF No. 1-2. On August 27, 2010, Multiplan removed the action to this Court with the consent of the other defendants. Notice of Removal ¶¶ 1, 4, ECF No. 1. In its Notice of Removal, Multiplan stated that the "action is one over which the United States District Court has original jurisdiction pursuant to 28 U.S.C. § 1331, inasmuch as the matter involves claims for the cost of benefits under group health benefit plans, which were established pursuant to ERISA . . . ." Notice of Removal ¶ 8. Multiplan further stated that, "[a]ny claims or causes of action sought to be stated by Plaintiff in its lawsuit, as to which district courts of the United States would not otherwise have original jurisdiction, are appropriate to be heard by this Court pursuant to the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367, and removal to this Court is appropriate pursuant to applicable law, including 28 U.S.C. § 1441." Notice of Removal ¶ 10.

On October 27, 2010, Sportscare filed a motion to remand. Pl.'s Mot. to Remand, ECF No. 15. The existing defendants filed a Brief in Opposition to Remand, arguing that the case was properly removed because some of Sportscare's state law claims were completely preempted by ERISA § 502(a), and other claims were completely preempted by the Federal Employees Health Benefits Act ("FEHBA"). Defs.' Br. in Opp. to Remand ("Opp. to Remand"), ECF No. 19. Attached to the brief was an affidavit stating that Defendant NALC was a government-sponsored health care plan governed by the FEHBA. Opp. to Remand Ex. A ¶ 3, ECF No. 19. On January 24, 2011, the Honorable

Mark Falk filed a Report and Recommendation recommending that Sportscare's motion to remand be denied. Report and Rec., ECF No. 33. On February 10, 2011, this Court entered an order adopting the Report and Recommendation and denying the motion to remand. Order, ECF No. 37.

On May 13, 2011, Sportscare filed an amended complaint asserting three causes of action under ERISA. On December 5, 2011, Sportscare filed the Second Amended Complaint. Seven defendants have been dismissed from the action. Eleven of the remaining defendants have now filed motions.

## II.   LEGAL STANDARDS

### A.  Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss under Rule 12(b)(6), a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998).

Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 129 S.Ct. at 1949 (2009).

As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). Where matters outside the pleadings are presented and not excluded by the court, a motion to dismiss should be treated as one for summary judgment. Fed. R. Civ. P. 12(d); *Carter v. Stanton*, 405 U.S. 669, 671 (1972). Treating a motion to dismiss as a motion for summary judgment is appropriate so long as the parties are on notice that materials outside the pleadings might be considered. *See Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 284-85 (3d Cir. 1991) (requiring that

parties have notice before a district court converts a Rule 12(b) (6) motion to one seeking summary judgment); *Inter Business Bank, N.A. v. First Nat'l Bank of Mifflintown*, 318 F.Supp.2d 230, 235 (M.D. Pa. 2004) (permitting resolution of the case on cross-motions for summary judgment concurrently).

### B. Motion for Summary Judgment

Federal Rule of Civil Procedure 56 provides for summary judgment "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp*., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The Court considers all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.2d 641, 647 (3d Cir. 2007).

### C. Motion for Judgment on the Pleadings

Pursuant to Federal Rule of Civil Procedure 12(c), judgment on the pleadings will be granted only if "the movant clearly establishes there are no material issues of fact, and he is entitled to judgment as a matter of law." *Sikirica v. Nationwide Insurance Co.*, 416 F.3d 214, 220 (3d Cir. 2005) (citing *Society Hill Civic Ass'n v. Harris*, 632 F.2d 1045, 1054 (3d Cir. 1980)). The court "must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Id.* In deciding a motion for judgment on the pleadings, the court considers the pleadings and attached exhibits, undisputedly authentic documents relied on by plaintiffs and attached to the motion, and matters of public record. *Atiyeh v. Nat'l Fire Ins. Co. of Hartford*, 742 F. Supp. 2d 591, 595 (E.D. Pa. 2010).

## III. DISCUSSION

The Complaint alleges that Sportscare is an ERISA beneficiary because it received an assignment of benefits from its patients encompassing the right to receive payment under the Plans. The Complaint has three Counts. In Count 1, Sportscare asserts a claim under Section 502 of ERISA to enforce the terms of the Plans providing that out-of-network providers are paid the UCR rate, not the discounted PPO rate. In Count 2, Sportscare asserts a claim for breach of fiduciary duty. Sportscare argues that Defendants are ERISA fiduciaries under 29 U.S.C. § 1002(21)(A), and that Defendants breached their duty of loyalty and due care by maximizing profits to themselves, rather than paying Sportscare at the UCR rate. In Count 3, Sportscare asserts that Defendants breached their duty to act in good faith, again arising from their position as ERISA fiduciaries.

This matter comes before the Court on eleven pending motions: (1) seven motions filed by the Tower Defendants, (2) a motion for summary judgment filed by Christian Brothers, (3) two motions to dismiss filed by the GEHA Defendants, and (4) a motion for summary judgment filed by Health Net, Inc.  The Court will address each in turn.

### A.  Motions Filed by the Tower Defendants

Defendants Tower, Guardian, Principal, Local 15, IDA, and Coventry filed motions to dismiss for failure to exhaust administrative remedies or, in the alternative, for summary judgment.  Defendant Nippon filed a motion for judgment on the pleadings or, in the alternative, for summary judgment.[3]  Because the Court must consider matters outside the pleadings to resolve the issue of administrative exhaustion, the Court will treat the Tower Defendants' motions as motions for summary judgment.  *See* Fed. R. Civ. P. 12(d); *Carter v. Stanton*, 405 U.S. 669, 671 (1972).  Both parties were on notice that the motions might be treated as motions for summary judgment, as both parties submitted statements or counterstatements of material facts, along with declarations and exhibits that would not properly be considered on a motion to dismiss.  *See Ford Motor Co.*, 930 F.2d at 284-85 (requiring that parties have notice before a district court converts a Rule 12(b) (6) motion to one seeking summary judgment).  For the reasons set forth below, the Tower Defendants' motions for summary judgment are **DENIED**.

### i.  The Parties' Arguments

The Tower Defendants argue that summary judgment should be entered against Sportscare because Sportscare failed to exhaust its administrative remedies before filing suit as required by ERISA.  Specifically, the Tower Defendants argue that each of the Plans provided for a formal administrative appeals process to be used whenever a claim for benefits was denied.  These appeals processes required claimants to file written submissions with the appropriate administrators on a particular timeline.  The Tower Defendants argue that Sportscare did not even initiate, let alone exhaust, the administrative remedies set forth in the Plans.  They also argue that Sportscare's telephone conversations and email correspondence with Multiplan were insufficient to show administrative exhaustion.  Finally, they assert that Sportscare failed to show that exhausting each Plan's administrative remedies would be futile.

Sportscare argues that summary judgment is not appropriate in this case.  Specifically, Sportscare argues that the administrative remedies set forth in the Plans are inapplicable here because Sportscare is not contesting individual benefits determinations on specific claims.  Rather, it is challenging an across-the-board methodology used to

---

[3] As noted above, Defendants Tower, Guardian, Principal, Local 15, IDA, Coventry, and Nippon are collectively referred to herein as the "Tower Defendants."  Although Defendant Nippon filed a motion for judgment on the pleadings instead of a motion to dismiss, Nippon raised substantially the same arguments that the other Tower Defendants raised in their motions.

determine the rates at which it is paid. Sportscare argues that it appealed Multiplan's decision determining that it was an in-network provider, that the appeal resulted in another denial, and that "any further attempts to appeal the decision [were] futile and would be frivolous, leaving no option to Sportscare except to institute this lawsuit." Compl. ¶ 27. Sportscare also argues, in the alternative, that resorting to the administrative remedies set forth in the Plans would have been futile.

### ii.  The Legal Standard for Administrative Exhaustion

An ERISA beneficiary may bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of his plan, or to clarify his rights to future benefits under the terms of the plan . . . ." 29 U.S.C. § 1132(a)(1)(B); *see also Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 249 (3d Cir. 2002). "Except in limited circumstances . . . a federal court will not entertain an ERISA claim unless the plaintiff has exhausted the remedies available under the plan." *Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir. 1990); *Zipf v. Am. Tel. & Tel. Co.*, 799 F.2d 889, 892 (3d Cir. 1986); *see also Amato v. Bernard*, 618 F.2d 559, 567 (9th Cir.1980) ("[S]ound policy requires the application of the exhaustion doctrine in suits under [ERISA]."). Courts require exhaustion of administrative remedies "to help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned." *Harrow*, 279 F.3d at 249 (quoting *Amato*, 618 F.2d at 567).

A plaintiff is excused from exhausting administrative procedures under ERISA if it would be futile to do so. *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 916 (3d Cir. 1990) ("Although the exhaustion requirement is strictly enforced, courts have recognized an exception when resort to the administrative process would be futile."). Plaintiffs merit waiver of the exhaustion requirement when they provide a "clear and positive showing of futility." *Brown v. Cont'l Baking Co.*, 891 F. Supp. 238, 241 (E.D. Pa. 1995); *see also Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 419 (6th Cir. 1998) ("A plaintiff must show that 'it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision.'") (quoting *Lindemann v. Mobil Oil Corp.*, 79 F.3d 647, 650 (7th Cir. 1996)). Whether to excuse exhaustion on futility grounds rests upon weighing several factors, including: (1) whether plaintiff diligently pursued administrative relief; (2) whether plaintiff acted reasonably in seeking immediate judicial review under the circumstances; (3) the existence of a fixed policy denying benefits; (4) failure of the insurance company to comply with its own internal administrative procedures; and (5) testimony of plan administrators that any administrative appeal was futile. *Harrow*, 279 F.3d at 250.

12

### iii. Sportscare Exhausted Its Administrative Remedies

In this case, the gravamen of the Complaint is that Defendants underpaid Sportscare because Multiplan mis-designated Sportscare as an in-network provider. Because this case involves a determination made by a PPO, and subsequent underpayment by the health care payors, this case presents an unusual question with respect to the exhaustion of administrative remedies; namely, whether Sportscare was required to exhaust the administrative remedies provided by the health care payors, or the PPO, or both. The Court finds that: (1) Sportscare was not required to exhaust the administrative remedies provided by the Tower Defendants; (2) Sportscare was required to exhaust the remedies provided by Multiplan; and (3) Sportscare did, in fact, exhaust Multiplan's administrative remedies.

Sportscare was not required to exhaust the administrative remedies provided by the Tower Defendants. The administrative remedies set forth in the Plans were put in place to address cases where "claim[s] for benefits [are] denied." Tower Plan at 103. As the Plan documents make clear, these are fact-specific determinations that are made on a claim-by-claim basis. Each appeal requires an administrator to evaluate the individual claim, the claimant's medical circumstances, the claimant's documents and records, the Plan language, the relevant internal rules and guidelines, and the opinions of health care professionals with training and experience in the relevant field of medicine. *See* Tower Plan at 103. In light of all of these factors, the administrator can determine that a procedure was experimental, not medically necessary, or not covered by the Plan. *See id.*

Those remedies are wholly inapplicable here. This is not a case in which 2,500 individual claims were denied because an administrator determined that a procedure was not medically necessary. This is not a case in which 2,500 individual claims were denied because an administrator determined that a procedure was not covered by the terms of a Plan. This is not a case in which individual claims were denied at all. Rather, this is a case where one entity made one decision, and that decision caused an across-the-board error in the way that a provider was paid. Sportscare should not be required to appeal 2,500 claims to dozens of different health insurance companies when the PPO is the sole entity that can fix that error. *Cf. Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 420 (6th Cir. 1998) (defendants "miscast this action as one primarily for a claim-by-claim payment of medical benefits, [when] in reality this action is only tangentially about the reimbursement of individual medical claims. Instead, this case centers on [plaintiff's] attempt to challenge defendants' across-the-board application of a methodology for determining reasonable and customary" rates). Accordingly, the administrative remedies set forth in the Plans are simply not relevant to this dispute, and there is no reason that Sportscare should be required to exhaust them before filing suit.[4]

---

[4] Because the Court finds the administrative remedies set forth in the Plans to be inapplicable to this dispute, the Court does not address the question of whether using those remedies would be

Sportscare was required to exhaust the administrative remedies provided by Multiplan. In this case, Multiplan was the only relevant decision-maker. As the entity that maintained the PPO network, Multiplan had the final say in determining which providers were designated as in-network providers and which were designated as out-of-network providers. When Sportscare requested that it be designated as an out-of-network provider, Multiplan was the one that made the decision to deny this request. Thus, Sportscare had an obligation to exhaust all of the administrative channels made available by Multiplan before filing suit.

Sportscare did, in fact, exhaust the administrative remedies made available by Multiplan. Sportscare requested that Multiplan re-designate it as an out-of-network provider. Multiplan denied the request. Multiplan did not have a formal appeals process in place, so Sportscare spent months making phone calls and sending emails, trying to convince Multiplan to reconsider its decision. The issue was considered "a top priority" and was raised with Multiplan's "Legal department" and "Executive management." Duer Cert. Ex. C. The issue was reviewed by numerous Multiplan representatives, including a Network Development Specialist, a Provider and Client Service Manager, the Vice President of National Ancillary Contracting, and the Executive Vice President and General Counsel for Multiplan. After months of evaluation, Sportscare received a formal letter from the Vice President of Service Operations denying the request and stating that "Multiplan considers this matter closed." Duer Cert. Ex. H. Multiplan then informed Sportscare that it intended to destroy the boxes of disputed claims. Based on these facts, it is hard to imagine what more Sportscare could do to argue its case to Multiplan. Accordingly, the Court finds that Sportscare was left with no choice but to file suit. *See Republic Industries, Inc. v. Central Pennsylvania Teamsters Pension Fund*, 693 F.2d 290, 296 (3rd Cir. 1982) (holding that the law does not require parties to engage in meaningless acts or to needlessly squander resources as a prerequisite to commencing litigation).

Because the Court finds that Sportscare exhausted the relevant administrative remedies, the Tower Defendants' motions for summary judgment are **DENIED**.

### B.  Motion for Summary Judgment Filed by Christian Brothers

Defendant Christian Brothers moves for summary judgment on the ground that it is a church plan that is not subject to ERISA. Sportscare opposes the motion on the ground of judicial estoppel. For the reasons set forth below, Christian Brothers's motion for summary judgment is **GRANTED**.

ERISA does not apply to church plans. ERISA defines a "church plan" as "a plan established and maintained . . . for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of

---

futile.

Title 26." 29 U.S.C. § 1002(33). Pursuant to the clear language of the statute, ERISA does not apply to church plans. 29 U.S.C. § 1003(b)(2) ("The provisions of this subchapter shall not apply to any employee benefit plan if . . . such plan is a church plan (as defined in section 1002(33) of this title)"). The Christian Brothers Plan is a plan established by the Catholic Church for the benefit of its employees. Phillips Decl. ¶ 3. The IRS has designated it as a tax-exempt church plan. Phillips Decl. ¶ 5. Because the plan administered by Christian Brothers is a church plan, Sportscare cannot state a cause of action against Christian Brothers under ERISA.

Sportscare does not dispute any of these arguments. Instead, Sportscare argues that judicial estoppel bars Christian Brothers from taking the position that it is not an ERISA entity. Sportscare asserts that, in the defendants' Brief in Opposition to Remand, the defendants took the position that this case was properly removed to federal court because the defendants administered ERISA-qualified plans. This Court adopted the defendants' position, finding that the case was properly removed. Sportscare argues that Christian Brothers should not be allowed take an inconsistent position now by arguing that it is not an ERISA entity. Sportscare asserts that, "without [Christian Brothers] misrepresenting itself as an ERISA entity, no other defendant in this case . . . would have been able to remove the case to Federal court." Pl.'s Br. in Opp. to Christian Brothers Service's Mot. for Summ. Judg. at 6, ECF No. 99.

Under the doctrine of judicial estoppel, a court can defend the integrity of the judicial process by barring a party from taking contradictory positions during the course of litigation. *See Zedner v. United States*, 547 U.S. 489, 504 (2006). A key concern underlying the doctrine is "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001). Judicial estoppel applies when three factors have been met. *Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779 (3d Cir. 2001); *G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262 (3d Cir. 2009). First, the party to be estopped must have taken two positions that are "irreconcilably inconsistent." *Id.*; *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir. 1996). Second, the party must have changed its position in bad faith, *i.e.*, "with intent to play fast and loose with the court." *Montrose*, 243 F.3d at 779. Third, "a district court may not employ judicial estoppel unless it is 'tailored to address the harm identified' and no lesser sanction would adequately remedy the damage done by the litigant's misconduct." *Id.* at 779-80 (quoting *Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 108 (3d Cir. 1999)).

The application of judicial estoppel in this case is wholly inappropriate for two reasons. First, there is no unfair advantage. Sportscare asserts that Christian Brothers gained an unfair advantage in the litigation because, if it had held itself out a non-ERISA entity, the case could not have been removed to federal court. This argument reflects a fundamental misunderstanding of the requirements of removal. It is black letter law that

15

a case is properly removed to federal court if there is *a single federal question* present in the complaint. *See* 28 U.S.C. § 1441; 28 U.S.C. § 1331. If there is a single federal question present in the complaint, then a district court "ha[s] supplemental jurisdiction over all other [related] claims." 28 U.S.C. § 1367. Further, if a state law claim is one seeking relief for benefits under an ERISA plan, then the doctrine of complete preemption converts the state law claim into a federal claim. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004). Taken together, this means that if there is a state law complaint with *any* claim seeking benefits under an ERISA plan, then that entire case, including all other defendants and all other claims, is properly removed to federal court. As discussed above, Sportscare is seeking relief for benefits under numerous ERISA plans. Accordingly, Christian Brothers did not gain an unfair advantage because the case would have been removed regardless of whether Christian Brothers was an ERISA entity.

Second, Christian Brothers never took an inconsistent position in this case. Multiplan removed this action on the ground that the case involved health care plans that were subject to ERISA. The other Defendants, including Christian Brothers, merely consented to that removal. Neither Multiplan nor the other Defendants ever suggested that every Defendant in the case was subject to ERISA. The Notice of Removal expressly stated that the Court had supplemental jurisdiction over any claims that were not preempted by ERISA, explicitly recognizing that there may be claims that were not subject to ERISA. *See* Notice of Removal ¶ 10. And in Defendants' Brief in Opposition to Remand, Defendants argued that removal was also proper for reasons completely independent of ERISA. Opp. to Remand at 12-13. Thus, the prior positions taken by Defendants in no way contradict Christian Brothers's position that it is not an ERISA entity.

Accordingly, Christian Brothers's motion for summary judgment on the ERISA claims is **GRANTED**. In the event that the motion for summary judgment was granted, Sportscare argued that it should be given leave to amend the Complaint to assert non-ERISA claims against Christian Brothers. The Court finds this request to be reasonable. Accordingly, Sportscare is granted leave to amend the Complaint to assert non-ERISA claims against Christian Brothers.

### C. Motions to Dismiss Filed by the GEHA Defendants

Defendants GEHA and NALC move to dismiss on the ground that they are governmental health insurance plans that are not subject to ERISA.[5] Sportscare opposes the motions on the ground of judicial estoppel. For the reasons set forth below, the GEHA Defendants' motions to dismiss are **GRANTED**.

---

[5] As noted above, Defendants GEHA and NALC are collectively referred to herein as the "GEHA Defendants."

ERISA does not apply to governmental plans. ERISA defines a "governmental plan" as "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." 29 U.S.C. § 1002(32). Pursuant to the clear language of the statute, ERISA does not apply to governmental plans. 29 U.S.C. § 1003(b)(1) ("The provisions of this subchapter shall not apply to any employee benefit plan if . . . such plan is a governmental plan (as defined in section 1002(32) of this title)"). Instead, governmental plans are governed by the Federal Employee Health Benefits Act ("FEHBA"), 5 U.S.C. § 8901 *et seq.* The FEHBA authorizes the U.S. Office of Personnel Management ("OPM") to contract with insurance carriers to provide federal employee benefits and to promulgate regulations governing the provision and administration of those benefits. 5 U.S.C. § 8913. Like ERISA, the FEHBA completely preempts state laws that relate to federal employees' health insurance benefits. 5 U.S.C. § 8902(m)(1) ("The terms of any contract under this chapter which relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans.").

The GEHA Defendants are governmental plans. GEHA insures a health plan for federal employees that is sponsored by OPM. McEnroe Aff. ¶ 3. NALC insures a health plan for city letter carriers employed by the U.S. Postal Service. Moore Aff. ¶ 3. Because the GEHA Defendants are governmental plans, Sportscare cannot state a cause of action against them under ERISA.

Sportscare does not dispute any of these arguments. Instead, Sportscare argues that judicial estoppel bars the GEHA Defendants from taking the position that they are not ERISA entities. Sportscare asserts that, in the defendants' Brief in Opposition to Remand, the defendants took the position that this case was properly removed to federal court because the defendants administered ERISA-qualified plans. This Court adopted the defendants' position, finding that the case was properly removed. Sportscare argues that the GEHA Defendants should not be allowed to take an inconsistent position now by arguing that they are not ERISA entities.

In this case, the application of judicial estoppel is wholly unwarranted for three reasons. First, the GEHA Defendants have never taken inconsistent positions in this litigation. In the defendants' Brief in Opposition to Remand, defendants dedicated an entire section to explaining that certain claims in the case were preempted by the FEHBA, not ERISA. Opp. to Remand at 12-13. The defendants even attached an affidavit to provide evidence that the NALC Plan was a federal employee benefit plan. *See* Moore Aff. ¶ 3. That position is entirely consistent with the GEHA Defendants' current position that they are not entities that are subject to ERISA. Second, even if the GEHA Defendants had taken an inconsistent position, they did not derive any unfair advantage. Both ERISA and the FEHBA completely preempt related state law claims.

17

Thus, removal would have been proper under ERISA or the FEHBA. Because the result would have been the same under either statute, the GEHA Defendants could not have gained an unfair advantage by relying on ERISA as a basis for removal. Finally, there is no support whatsoever for Sportscare's assertion that the GEHA Defendants acted with subjective bad faith.

Accordingly, the GEHA Defendants' motions to dismiss the ERISA claims against them are **GRANTED**. Sportscare is granted leave to amend the Complaint to assert non-ERISA claims against the GEHA Defendants.

### D.  Motion for Summary Judgment Filed by Health Net, Inc.

Defendant Health Net, Inc. moves for summary judgment on the ground that it is not responsible for the payment of claims. Sportscare opposes the motion, arguing that there is a disputed issue of fact about whether Health Net, Inc. is an insurer. For the reasons set forth below, Health Net, Inc.'s motion for summary judgment is **GRANTED**.

Health Net, Inc. argues that it is not a health care payor, and thus could not be responsible for paying claims for medical services rendered by Sportscare. In support of its motion, Health Net, Inc. attached the Declaration of Corinne Sotolov, a Litigation Manager in Health Net, Inc.'s Legal Department. *See* Sotolov Decl., ECF No. 60-3. According to the Declaration, Health Net, Inc. is a managed care organization and the parent company of separately licensed and regulated subsidiaries that provide health care benefits to individuals and groups. Sotolov Decl. ¶ 3. Health Net, Inc. itself does not sponsor, insure or administer employee welfare benefit plans and does not provide health care coverage to any individual or entity. Sotolov Decl. ¶ 4. Health Net, Inc. does not pay for medical services provided to patients and does not pay claims for insureds or plan members. Sotolov Decl. ¶ 5. According to the Declaration, Health Net, Inc. is not responsible for the payment of claims for any of the individuals included in the claims data provided by Sportscare. Sotolov Decl. ¶¶ 6-7.

Sportscare argues that there is a disputed issue of fact about whether Health Net, Inc. is an insurer. In support of this argument, Sportscare attached copies of two health insurance cards from its patients bearing the words "Health Net." Certification of Denine Lucas ("Lucas Cert.") Ex. A, ECF No. 103. One of the cards also bears the name "Guardian." *See id.* Sportscare also attached a screenshot of a webpage in which various Health Net, Inc. entities are generally referred to using the trade name "Health Net." Lucas Cert. Ex. B.

The Court finds that Health Net, Inc. is not a proper defendant in this case. A plaintiff has the burden of naming the proper defendants to its case and cannot simply name a corporation hoping that it will catch all related corporate entities. *See Benjamin v. E. Orange Police Dep't*, No. 12-774, 2013 WL 1314418, at *2 n.2 (D.N.J. Mar. 28, 2013) ("the burden is on a plaintiff to identify the proper defendants to an action, and this

is typically done before, not after, filing a complaint"); *Goodman v. Praxair, Inc.*, 494 F.3d 458, 473 (4th Cir. 2007) ("a plaintiff has the burden of locating and suing the proper defendant"). Although the use of the trade name "Health Net" on health insurance cards is somewhat confusing, this evidence does not directly refute the evidence provided in the Sotolov Declaration that the corporate entity Health Net, Inc. is a parent company that is not, itself, responsible for the payment of claims. Because Health Net, Inc. did not pay any of the claims at issue in this case, it is not a proper defendant.

Accordingly, Health Net, Inc.'s motion for summary judgment is **GRANTED**.

### IV. CONCLUSION

For the reasons stated above, the motions filed by the Tower Defendants are **DENIED**; the motion for summary judgment filed by Christian Brothers is **GRANTED**; the motions to dismiss filed by the GEHA Defendants are **GRANTED**; and the motion for summary judgment filed by Health Net, Inc. is **GRANTED**. Sportscare is granted leave to amend the Second Amended Complaint to add non-ERISA claims against Christian Brothers, GEHA, and NALC. An appropriate order follows.

/s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: April 17, 2013**